(No. 6575.   March 8, 1939.)

ALVA PROUTY ELEY, Respondent, v. EVA LYON, Administratrix, Appellant.

[88 Pac. (2d) 507.]

Harry S. Kessler, for Appellant.

Wright A. Stacy, for Respondent.

HOLDEN, J.—May 30, 1932, Carl Prouty, a widower, was engaged in the business of contracting, and in operating a service station in the city of Boise. In addition to gas and oil, Prouty carried tires, inner tubes, belts, and other merchandise. On that day he made a financial statement to

the Miller Rubber Products Company of Los Angeles, California, in which he represented his total current liabilities amounted to the sum of $400; that he was the owner of real and personal property of the net worth of $40,900. June 1, 1932, Prouty conveyed all his deeded real property to Alva Prouty, his daughter (then a single woman), for a recited consideration of "ten (and other valuable considerations) dollars." The deed also recited "it is further understood and agreed by and between the parties hereto, that the party of the first part (Carl Prouty), is to have a home upon said property during the term of his natural life and no longer." It was typed by his daughter, Alva (the grantee), at the Prouty home in the city of Boise, under the direction of L. M. Lyon, an attorney and notary public, after which the father signed the deed. It appears the attorney did not have his notarial seal with him, and the seal, therefore, was not impressed upon the instrument until the next day in Lyon's office. The deed was returned to the Prouty home in an envelope, but by whom, the record does not disclose, after which, at the direction of the grantor, the deed was placed by the grantee "in a box inside of another locked chest." Later, January 4, 1933, the father directed the daughter to have the deed recorded, which she did. While it did not reserve the income of the real property to the grantor, it was understood he would receive it until the date of his death, and he did. The father died September 26, 1934.

A part of the personal property covered by the financial statement consisted of Liberty and B. P. O. E. bonds listed at $10,000. These bonds were in an iron box, locked up, and in either the box or a dresser there was a sealed envelope containing a note written by Carl Prouty to his son, Cyril A. Prouty. Although the record does not disclose the contents of the note, respondent testified it was always understood that upon the death of the father Cyril was to get these bonds.

Between December 19, 1932, and August 11, 1933, five creditors (excluding the Miller Rubber Products Company), prosecuted actions against Prouty for the recovery of small

claims totaling $383.70. December 30, 1932, Prouty, for a recited consideration of $200 (and other valuable considerations), sold to his daughter, Alva Prouty Eley, the livestock on the Prouty farm (included with other tracts of land in the above-mentioned deed), together with all farm and dairy equipment, hay and grain. January 10, 1933, Prouty, by bill of sale, sold to his son-in-law, John S. Eley, then and still the husband of Alva Prouty, a Knickerbocker concrete mixer, building hoists, tools, equipment and machinery, also surveyor's transit, levels, etc.

Some time in May, 1933, the Miller Rubber Products Company commenced an action in the district court, in and for Ada county, against Prouty. May 18, 1934, the company recovered judgment for $526.27. August 26, 1934, an execution issued and was placed in the hands of the sheriff who levied upon and sold Lot 2, Block 72, of the Original Townsite of Boise City, Ada county, Idaho, to L. M. Lyon. October 8, 1934, the sheriff issued a certificate of sale to the purchaser, and October 11, 1935, executed and delivered a deed of the property to him.

August 28, 1935, Alva Prouty Eley commenced suit against the Miller Rubber Products Company and L. M. Lyon to quiet title to the property conveyed to Lyon by the sheriff, basing her claim of title to such property upon the conveyance executed by her father June 1, 1932. December 18, 1935, the company and Lyon jointly answered the complaint denying the material allegations and filed a cross-suit to set aside the deed, charging it was executed with intent to hinder, delay and defraud the Miller Rubber Products Company and other Prouty creditors, which respondent, by answer, denied. Thereafter, on motion of the respondent, the Miller Rubber Products Company was dismissed as a party defendant to the main controversy. L. M. Lyon died during the pendency of the suit in the district court, and his widow, Eva M. Lyon, administratrix of his estate, was substituted. The case was tried October 19, 1937. March 4, 1938, findings of fact and conclusions of law were made and filed. March 9, 1938, a decree was rendered and entered on such findings,

quieting title in respondent, from which the administratrix prosecuted an appeal to this court.

Two questions are presented by the record: First, was there a legally sufficient delivery of the deed from Carl Prouty to his daughter, and secondly, was the conveyance made with intent to hinder, delay or defraud Prouty's creditors? ▉ On the first question, Alva Prouty Eley testified:

"Q. And when (after it had been taken to Lyon's office) did you next see the deed?

"A. Oh, maybe in two or three days. It was on the table, and Dad asked me to put it away.

"Q. At the time that that deed was signed or made out, what did your father say about that deed?

"A. He said he wasn't trying to let anybody think he was broke, but Mother died suddenly and he was afraid he was going to from what Dr. Pittinger told him, to go slow or he might drop dead.

"Q. Did he give you the deed at that time? When did your father deliver that deed to you?

"A. As quick as he saw it lying on the table.

"Q. After it had come back from Lyon's office he delivered it to you?

"A. Yes, sir." . . . .

"Q. Was it your father's deed, considered as his property, or was the deed to be considered as your property?

"A. It was my property.

"Q. Under what circumstances did that arise? How did your father come to convey that to you?

"A. Because he didn't want—

"Q. No. That is not what I said. How did you know that was your deed? What was the conversation between you and your father?

"A. He said that my mother had died suddenly.

"Q. Yes.

"A. And that he might, because they had told him he would, and he wanted me to not go through alone, possibly, what he had been through.

"Q. You have reference to the probating of the estates?

"A. Everything, yes, like that.

"Q. And he gave it to you that morning after he had come back from the mine?

"A. Yes, sir.   He came home for lunch.

"Q. What did you do?

"A. I put it in another sealed box.

"Q. Your box?

"A. My own, and locked it up in a cedar chest. . . . .

"Q. In other words, this deed was given to you to really take effect upon his death your father, however, to have all the income.

"A. No; it was to take effect then because he was leaving for another mine, and I was to look after everything, which I did."

The decision of the first question depends upon the testimony of Alva Prouty, the only person called to testify on the trial of the case.   It appears from her testimony the father, noticing the deed lying on the table (after the seal had been impressed and it had been returned to the Prouty home), handed it to Alva, thus establishing beyond any question the actual, manual delivery of the instrument.   But was the deed accepted by the daughter?   That too, is clearly proven.   The daughter testified her father gave her the deed; that she placed it in her own sealed box, locked it up and considered it her property.

In *Bowers v. Cottrell,* 15 Ida. 221, 96 Pac. 936, we said: "No particular form of delivery of a deed is required. Whether there was a delivery of a deed so as to pass title depends in a great measure upon the particular circumstances of each case, the test being, was a delivery made by grantor to grantee, or some other person for grantee, and accepted by the grantee, with the intention of passing title and making such instrument the deed of the grantor.   Delivery includes surrender and acceptance, and both are necessary to its completion.   The grantor must be willing and agree to deliver, and the grantee must be willing and consent to receive, and this accord of wills must be evidenced in some way to show the unequivocal intention of both parties that the instrument shall take effect according to its purport and tenor."

In *Flynn v. Flynn*, 17 Ida. 147, 104 Pac. 1030, we held that the usual test is: "Did the grantor by his acts or words, or both, manifest an intention to make the instrument delivered his deed and thereby divest himself of title?"

Applying the above-stated rule to the evidence, we are impelled to the conclusion that Carl Prouty executed and delivered the deed in question with intent to part with all control over it and to divest himself of and to vest title to the property in his daughter, that it was the intention of both parties the deed should take immediate effect according to its purport and tenor, and that she accepted delivery with that understanding.

During the course of the trial appellant introduced the financial statement hereinbefore mentioned in which Prouty listed his real and personal property as being of the market value of $43,100. He also listed "Accounts payable (not due), $400," and the net worth of his property at $40,900. Prouty included in the statement an item of $2,500 in cash then on deposit in a local bank. It further shows none of the property, real or personal, was incumbered either by liens, chattel or real estate mortgages.

Appellant did not attempt to prove any of the listed property was worth less than Prouty represented, nor that his accounts payable were greater than represented, nor that Prouty owed a dollar to any person whomsoever, which was then due, so it must be conceded that at the time the statement was made, Prouty owned real and personal property of the net market value of $40,900, and his contingent liabilities amounted to only $400.

The record shows Prouty was afflicted with heart trouble and expected to die suddenly and that he later did so die— dropped dead. It further appears that after he conveyed the property in question to his daughter he had left $2,500 in cash on deposit in the bank, and Liberty and B. P. O. E. bonds listed at $10,000. It may be added, no attempt was made to prove these bonds were worth less than represented. Moreover, at that time, Prouty was not indebted to the Miller Rubber Products Company in any sum or amount, or at all, and as late as August 11, 1933, the total claims against him

did not exceed $383.70, exclusive of the claim of the Miller Rubber Products Company. That brings us to the consideration of the second question: Was the conveyance, in these circumstances, made with intent to hinder, delay or defraud the Miller Rubber Products Company, the only complaining creditor? Section 54–906, I. C. A., provides that: "Every transfer of property, or charge thereon made, every obligation incurred, and every judicial proceeding taken, with intent to delay or defraud any creditor or other person of his demands, is void against all creditors of the debtor and their successors in interest, and against any person upon whom the estate of the debtor devolves in trust for the benefit of others than the debtor." It was but natural that Prouty, expecting death to strike suddenly and without warning, would, impelled by fatherly love and affection, being unquestionably solvent and having two methods (deed or will) by which he could make respondent the object of his bounty, convey the property in question to her, as he did. This court held in *Crumpacker v. Bank of Washington County*, 38 Ida. 534, 223 Pac. 229, and *Green v. Bruck*, 58 Ida. 401, 74 Pac. 85, that if the facts from which the alleged fraud is supposed to arise are consistent with honest intentions, fraud will not be imputed.

But let us assume that Prouty, at the time of the execution of the gift deed, was actually indebted to the company in the full amount it some months later recovered a judgment against him for, to wit, $526.27, he would still have had left the sum of $2,500 in cash and $10,000 in bonds, far more than enough to satisfy the demand.

Appellant insists, however, that where a financial statement is made for the purpose of obtaining credit, and credit is extended in reliance upon the statement, and the grantee of the gift deed knows that, and withholds the deed from the record until after credit is extended, and the gift deed, together with other transfers, comprise practically all the property of the grantor, then the grantee is estopped from asserting title against a creditor who, in good faith, extended credit. First, it must be kept in mind the real property conveyed to the respondent did not "comprise prac-

tically all the property of the grantor." After the conveyance, Prouty had $2,500 in cash and $10,000 in bonds left. Next, appellant did not prove respondent knew, at the time the gift deed was made, her father had made a financial statement, hence she failed to bring herself within the rule she seeks to invoke.

Appellant also seeks to bring herself within *Louk v. Patten*, 58 Ida. 334, 73 Pac. (2d) 949. In that case, at the time Patten made the conveyance to his daughter, Leora M. Howell, there was an existing contingent liability in favor of Minnie Louk. Here, there was neither an existing nor a contingent liability in favor of the Miller Rubber Products Company, so it was not, in any way, a creditor at the time Prouty executed the gift deed to respondent. There, Patten conveyed all his property, both real and personal, of every kind and nature to his daughter and others. Here, Prouty did not, at the time he executed the gift deed to respondent, convey all his property to her nor did he transfer the remainder to others. In the Louk case it was "conclusively established" Patten's daughter knew at the time he delivered the deed to her he had breached his contract with Minnie Louk. Here, there is no proof of a breach of contract of any kind between Prouty and the Miller Rubber Products Company, out of which a liability, contingent or otherwise, could arise. Therefore, appellant also failed to bring herself within the rule announced in the Louk case.

Another case relied upon is *Chaney v. Gauld Co.*, 28 Ida. 76, 152 Pac. 468. Chaney was engaged in the plumbing business and kept a store where he had bath tubs and other plumbing supplies for sale. He had purchased plumbing supplies from the Gauld Company, and became indebted to it in the sum of about $1,200, and was either unable, or refused, to pay the same, and an action was brought against Chaney to recover the amount of the indebtedness. When the action was commenced, an attachment was issued and levied upon certain lands claimed to be the separate property of the wife, Edna A. Chaney. On the day following the commencement of the action, Chaney conveyed the tract to his wife. It was contended the land was her separate

property, in that it was claimed she made the first payment of $2,000 thereon with money borrowed from her father. The deed to the land had been taken in Chaney's name, but was kept in his possession and not recorded until the day after the action was brought to recover the debt. It appears an agent of R. G. Dun and Company had procured a signed statement from Chaney regarding his financial condition and had furnished an abstract of such statement to the Gauld Company, it being a subscriber, and in extending credit to Chaney, the Gauld Company relied upon the financial statement made by him to R. G. Dun and Company, and that Chaney, in his financial statement, had listed the tract of land covered by the deed and later claimed by his wife to be her separate property.

It was held that where a husband secures credit upon a financial statement of his assets and liabilities and lists the real estate of his wife, which stands in his name, as property belonging to him, the wife is estopped to assert her right to such property as against the creditors of her husband, which credit was obtained by reason of the fact that she permitted the title to the land to remain in her husband, and where the true owner of land permits the title to remain in her husband and he procures credit because of his apparent ownership, that under such facts the law is well settled where one of two innocent parties must suffer through the fraud of a third, the loss should fall upon the one who, by his own act, created the circumstances which permitted the fraud to be perpetrated. The rule of estoppel has no application to the facts of this case.

Some time after Prouty executed the gift deed, the bank failed in which he had deposited the item of $2,500 in cash, listed in his financial statement; then, apparently, followed the execution of the transfers of livestock, farm and dairy equipment, hay and grain to respondent, the concrete mixer, tools, etc., to Eley, the son-in-law, and the recording of the gift deed to the daughter. Appellant contends where a father secretly executes a gift deed to a daughter and about the time the deed is recorded also executes gift transfers of all the personal property listed in

a financial statement made for the purpose of obtaining credit, excepting an item of cash, that the gift deed is "presumptively fraudulent and null and void as to a creditor who extended credit in reliance on such financial statement and the real estate so attempted to be conveyed or any parcel thereof was subject to levy and sale under an execution issued on the judgment secured by such creditor." Appellant is mistaken in her statement of the facts. While, as hereinbefore pointed out, there is some evidence from which it might be inferred Prouty wanted the Liberty and B. P. O. E. bonds listed in his financial statement, to go to his son, Cyril, there is no evidence Prouty actually ever transferred the bonds to his son, or to anyone else. Hence, we must assume Prouty still owned the bonds at the time of his death, which, it must be conceded, were amply sufficient to pay the claim of the Miller Rubber Products Company.

██ If Prouty, at or about the time he made his financial statement and executed the gift deed to respondent, had made the transfers of personal property to his son-in-law and daughter, above mentioned, and also had transferred to his son, Cyril, the Liberty and B. P. O. E. bonds, leaving insufficient property to satisfy the claim of the Miller Rubber Products Company, and respondent had withheld the gift deed from the record with knowledge that her father had made the statement and was obtaining credit in reliance upon it, there would be some merit in appellant's contention, but that is not this case. To repeat, there is no evidence respondent knew, at the time the gift deed was executed, her father had made the financial statement or that credit was being extended in reliance upon it. Then too, the transfers of personal property to respondent and Eley were not made at or about the time of the execution of the gift deed, but some six months later. The validity of the deed to respondent does not depend upon subsequent events. (*McMillan v. McMillan*, 42 Ida. 270, 245 Pac. 98.) Finally, it appears from the record that L. M. Lyon was present in the Prouty home, heard the conversation between Prouty and his daughter in relation to the transfer of the property in question and dictated the typing of the gift deed which effected the con-

veyance later alleged by Lyon to be fraudulent. Therefore, assuming, but not conceding, the gift deed was executed for the purpose of defrauding creditors, Lyon participated in the transaction, thus creating a situation analogous to that where parties are *in pari delicto* in the execution of an illegal contract—the law leaves such parties where it finds them (*McFall v. Arkoosh,* 37 Ida. 243, 246, 215 Pac. 978, *Berryman v. Dore,* 47 Ida. 582, 586, 277 Pac. 565), and those claiming under and in privity with them. It follows the judgment must be affirmed, and it is so ordered. Costs awarded to respondent.

Ailshie, C. J., Givens and Morgan, JJ., concur.